IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| JOSHUA FULLER-DEETS, | * |
| Plaintiff, | * |
| v. | * Case No.: GJH-18-3175 |
| | * |
| NATIONAL INSTITUTES OF HEALTH, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Joshua Fuller-Deets brought this *pro se* civil action challenging the decision by Defendant National Institutes of Health ("NIH") to prohibit him from bringing a service dog in training to his job on the NIH campus under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and MD. CODE ANN., HUMAN SERVS. §§ 7-704, 7-705. ECF No. 15. Pending before the Court is Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment.[1] ECF No. 16. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendant's Motion, construed as a Motion for Summary Judgment, is granted.

**I. BACKGROUND**

NIH is an agency of the United States Public Health Service, which is a division of the United States Department of Health and Human Services ("HHS"). ECF No. 15 ¶ 16; *see* 42 U.S.C. §§ 202, 281. NIH's main campus is located in Bethesda, Maryland. ECF No. 15 ¶ 6.

---

[1] Also pending are Plaintiff's First, Second, and Third Consent Motions for Extension of Time to Respond to Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF Nos. 18, 19, 20, and Defendant's Consent Motion for Extension of Time to File Reply, ECF No. 22. These Motions are granted.

1

Since September 2016, Plaintiff has been employed as a computer systems analyst contractor assigned to the Laboratory of Sensorimotor Research, which is a part of the National Eye Institute at NIH. *Id.* ¶ 3.

### A. Legislative Background

Since 1943, Maryland law has provided that:

> (a) With respect to land that the United States or any unit of the United States leases or otherwise holds in the State, the State reserves jurisdiction and authority over the land, and persons, property, and transactions on the land, to the fullest extent that is:
>
> (1) allowed by the United States Constitution; and
>
> (2) not inconsistent with the governmental purpose for which the land is held.

MD. CODE. ANN., GEN. PROVISION § 6-201 (formerly MD. CODE ANN., STATE GOV'T § 14-102 and MD. CODE (1957), Art. 96 § 47).[2]

In 1953, the State of Maryland ceded to the federal government the property on which NIH's Bethesda, Maryland campus currently sits. 1953 Md. Laws 311–14. At the time of cession, Maryland stipulated that:

> Exclusive jurisdiction over the [NIH parcel of land] shall be and the same is hereby ceded to the United States for all purposes except that the State retains the right to serve thereon all civil and criminal process of the courts of this state, but the jurisdiction so ceded SHALL NOT VEST AS TO ALL OR ANY PORTION OF SAID PARCEL OF LAND UNLESS AND UNTIL THE UNITED STATES SHALL OWN IT, AND THE JURISDICTION shall continue no longer than the United States shall own such land.

*Id.* at 313 (emphasis in original).

In 1990, long after Maryland ceded the NIH property, NIH promulgated regulations governing the conduct of persons and traffic on the NIH campus. *See* Conduct of Persons and

---

[2] This provision was first enacted by the Maryland General Assembly in 1943. *See* 1943 Md. Laws 923.

Traffic on the National Institutes of Health Federal Enclave, 55 Fed. Reg. 2047, 2067 (Jan. 22, 1990). The regulations provided, in relevant part, that "[a] person may not bring on the enclave any cat, dog, or other animal except for authorized purposes. This prohibition does not apply to domestic pets at living quarters or to the exercise of these pets under leash or other appropriate restraints. The use of a dog by a handicapped person to assist that person is authorized." *Id.* at 2070; *see* 45 C.F.R. § 3.42(b). This regulation has been incorporated into the NIH Policy Manual. *See* ECF No. 16-4 at 15.[3] NIH regulations do not provide authorization for the use of animals by trainers of service animals.

Conversely, in 1997, Maryland's General Assembly enacted legislation that did provide protections to trainers of service animals (collectively, the "Service Animal Trainer Protections"). Section 7-704(a) of the Maryland Code's Human Services Article provides that "service animal trainers who are accompanied by an animal being trained or raised as a service animal have the same right as individuals without disabilities to the full and free use of the roads, sidewalks, public buildings, public facilities, and other public places." MD. CODE. ANN., HUM. SERVS. § 7-704(a). Section 7-704(b)(1) provides that "service animal trainers who are accompanied by an animal being trained or raised as a service animal are entitled to full and equal rights and privileges with respect to common carriers and other public conveyances or modes of transportation, places of public accommodations, and other places to which the general public is invited, subject only to any conditions and limitations of general application established by law." *Id.* § 7-704(b)(1). Section 7-705(c)(1) provides that "a service animal trainer may be accompanied by an animal that is being trained as a service animal in any place where an individual with a disability or a parent of a minor child with a disability has the right to be

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

accompanied by a service animal." *Id.* § 7-705(c)(1). Finally, Section 7-705(e)(2)(i) provides that "[a] person may not deny or interfere with the admittance of an animal being trained as a service animal that accompanies a service animal trainer." *Id.* § 7-705(e)(2)(i).

### B. Factual Background

Between September 2016 and January 2018, Plaintiff was a volunteer service animal raiser for New Horizons Service Dogs, an accredited service dog agency. ECF No. 15 ¶ 11. During that time, Plaintiff brought two golden retriever service-dogs-in-training to work on NIH's Bethesda campus. *Id.* ¶¶ 12, 13. At some point before May 2017, Plaintiff, through his supervisor Bevil Conway, asked permission to have another service-dog-in-training at work. ECF No. 16-4 ¶ 2; *id.* at 5. On December 15, 2017, David Schneeweis, Deputy Scientific Director at the National Eye Institute, emailed Plaintiff conveying that he had "heard from Bevil that questions are being raised over whether [Plaintiff] can continue to have [his] dog in [building] 49," and he invited Plaintiff to meet "to hear [Plaintiff's] perspective." *Id.* ¶ 3; *id.* at 5.

On January 11, 2018, Plaintiff emailed Mr. Schneeweis to "ask if [he]'d heard anything new on this issue," because New Horizons was slated to "have a new litter of animals ready in a month or two" and Plaintiff "need[ed] to give them some advance notice about whether [he] c[ould] take another dog or not." *Id.* ¶ 4; *id.* at 8. On January 22, 2018, Mr. Schneeweis responded to inform Plaintiff that he was "[g]athering information to give [Plaintiff] a complete response." *Id.* at ¶ 5; *id.* at 10.

On February 2, 2019, Plaintiff again emailed Mr. Schneeweis, sharing that he "need[ed] to let [New Horizons] know by mid-February whether [he would] be able to take an animal." *See id.* ¶ 6; *id.* at 13. On February 5, 2019, Mr. Schneeweis responded, informing Plaintiff that "there are two key issues: (1) What does NIH policy have to say; and (2) Is there any reason to believe

that NIH policy might be inconsistent with the law." *Id.* at 15. On the first issue, Mr. Schneeweis cited to Section 1301 of an NIH policy manual— tracking 45 C.F.R. § 4.32(b)—which provides that "[a] person may not bring on the [NIH] campus any cat, dog, or other animal except for authorized purposes." *Id.* He concluded that because "having a service animal in training on campus is not explicitly authorized, NIH policy dictates that it is not allowed." *Id.* On the second issue, Mr. Schneeweis stated that "the NIH Office of General Counsel weighed in, affirming that a service dog in training does not fall under [the] ADA because service animals are individually trained to do work or perform tasks for a disabled individual," and "while Maryland law gives additional rights to trainers … , the NIH is a federal enclave." *Id.* Mr. Schneeweis concluded: "While I applaud your commitment to a very worthwhile cause, I need to ask you to comply with existing NIH policy going forward." *Id.*

On September 7, 2018, Plaintiff emailed Mr. Schneeweis, informing him that Plaintiff "[ran] [his] situation by a couple of lawyers and [he had] decided to file an [APA] appeal regarding the NIH's decision to prohibit [his] campus access with a service animal in training." *Id.* at 18.

### C. Procedural Background

On October 12, 2018, Plaintiff filed a Complaint in this Court, ECF No. 1, and later amended the Complaint on April 16, 2019, ECF No. 15.[4] He alleges that Defendant's decision to ban him from bringing a service dog in training onto the NIH campus violates Maryland's Service Animal Trainer Protections. *Id.* Thus, pursuant to the APA, he asks the Court to declare "that there is no federal law which prohibits the Defendant from complying with Maryland laws related to [service dogs in training]" and to issue "an order setting aside the Defendant's actions

---

[4] The Amended Complaint is styled as the First Supplemented Motion for Declaratory and Other Relief. ECF No. 15. The Court will construe this as a Motion for Leave to File an Amended Complaint and grant the Motion.

5

and policies related to [service dogs in training]" and "requiring the Defendant to comply with state laws relating to [service dogs in training]…" *Id.* On May 6, 2019, Defendant filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 16. Plaintiff filed an opposition on July 22, 2019, ECF No. 21, and Defendant filed a reply on August 20, 2019, ECF No. 23.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendant has moved to dismiss this case pursuant to Rule 12(b)(1), asserting that the Court lacks subject matter jurisdiction over Plaintiff's APA claim. "A district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)). "The burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. East West Constr.*, 776 F.3d 271, 272 (4th Cir. 2015). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Where jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steele Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 19 L.Ed. 264 (1868)).

### B. Motion for Summary Judgment Pursuant to Rule 56(a)

Defendant moves in the alternative for summary judgment on Plaintiff's claim. Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record. *See Otsuka Pharm. Co., Ltd. v. Burwell*, Case No. GJH–15–852, 2015 WL 3442013, at *5 (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012)). Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See id.* (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Air Transp. Ass'n of Am. v. U.S. Dep't of Agric.*, 303 F. Supp. 3d 28, 38 (D.D.C. 2018) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).

Under the APA, the Court shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(D)). "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). Courts "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Sanitary Bd. of City of Charleston v. Wheeler*, 918 F.3d 324, 333 (4th Cir. 2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). Courts "will vacate agency action if it is not 'based on a consideration of the relevant factors' or where 'there has been a clear error of judgment.'" *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

### III. DISCUSSION

Defendant contends that the Court lacks subject-matter jurisdiction over Plaintiff's APA claim, and therefore this case must be dismissed. It contends further that even if the Court does have subject-matter jurisdiction, Plaintiff's claim fails on the merits because the Maryland Service Animal Trainer Protections do not apply to NIH under the federal enclave doctrine and NIH's decision to prohibit Plaintiff from bringing a service dog in training to work was not

8

arbitrary and capricious. The Court concludes that it does have subject-matter jurisdiction over Plaintiff's APA claim, but the claim fails on its merits.

### A. Subject-Matter Jurisdiction

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *J.O.P. v. U.S. Dep't of Homeland Sec.*, Case No. GJH–19–1944, 2019 WL 3536786, at *6 (D. Md. Aug. 2, 2019) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 296 (1992)). It provides for judicial review of any "[a]gency action made reviewable by statute" or "for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

As with any case in federal court, an APA claim cannot proceed unless the court has subject-matter jurisdiction over the action. *See Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019). However, the APA itself "is not a jurisdiction-conferring statute." *Lee v. U.S. Citizenship and Immigration Servs.*, 592 F.3d 612, 619 (4th Cir. 2010) (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006)) (internal quotation marks removed); *see also Califano v. Sanders*, 430 U.S. 99, 107 (1977) ("[T]he APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action."). "Rather, the jurisdictional source for an action under the APA is the 'federal question' statute, which grants the district court 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States,' and thereby 'confer[s] jurisdiction on federal courts to review agency action.'" *Lee*, 592 F.3d at 619 (quoting 28 U.S.C. § 1331 and *Califano*, 430 U.S. at 105).

Under the well-pleaded complaint rule, federal question jurisdiction exists where "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 606–7 (4th Cir. 2002). "In cases where federal law *creates* the cause of action, the courts of the United States unquestionably have federal subject matter jurisdiction." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 809 (1986)) (emphasis in original).

Here, federal question jurisdiction exists because federal law creates Plaintiff's cause of action. "The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' and applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. §§ 701(a), 704). In other words, it "provide[s] 'a limited cause of action for parties adversely affected by agency action.'" *Lee*, 592 F.3d at 619 (quoting *Trudeau*, 456 F.3d at 185); *see also Blackhawk Indus. Prods. Grp. Unltd., LLC v. U.S. Gen. Servs. Admin.*, 348 F. Supp. 2d 662, 667 (E.D. Va. 2004) (stating that a plaintiff "may challenge agency action under the APA even if a private right of action does not exist under [a] relevant statute").

Although Plaintiff alleges that Defendant violated the Maryland Service Animal Trainer Protections, which are state laws, those laws do not create his cause of action. Rather, Plaintiff's cause of action arises under the APA because he is challenging "final agency action for which there is no other adequate remedy in a court," *see* 5 U.S.C. § 704, and there is no statute that precludes judicial review of Defendant's actions or commits the particular action taken in this

case to agency discretion. Thus, because the APA is a federal law and it creates Plaintiff's cause of action, this court has subject-matter jurisdiction pursuant to § 1331. *See Blackhawk Indus.*, 348 F. Supp. 2d at 667 (finding that where a plaintiff had a right of action under the APA and no other federal statute precluded federal question jurisdiction, the court had federal question jurisdiction pursuant to § 1331); *see also Dhakal v. Sessions*, 895 F.3d 532, 538 (7th Cir. 2018) ("Although the APA is not an independent grant of jurisdiction, where federal jurisdiction is not precluded by another statute, general federal question jurisdiction exists under 28 U.S.C. § 1331."); *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 424 (6th Cir. 2016) (stating that "although the APA does not directly grant jurisdiction, the federal question statute, 28 U.S.C. § 1331, confers jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate." (internal citations and punctuation omitted)); *NMS Healthcare of Hagerstown, LLC v. U.S. Dep't of Health & Human Servs.*, 619 F. App'x 225, 226 (stating that "the jurisdictional source for an action under the APA is 28 U.S.C. § 1331, the federal question statute, which grants district courts original jurisdiction to review agency action").

In support of its motion to dismiss, Defendant contends that § 702 of the APA limits the Court's subject-matter jurisdiction. Section 702 states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. Defendant contends that a court only has subject-matter jurisdiction over an APA claim where the federal government has waived sovereign immunity and that § 702 only waives sovereign immunity where the plaintiff has suffered a legal wrong or where the plaintiff is adversely affected or aggrieved by agency action within the meaning of a relevant statute. Defendant argues that Plaintiff has not met this requirement for waiver of sovereign immunity because he has only alleged that he was harmed under a state law. The Court disagrees.

Although Defendant is correct that federal courts lack subject-matter jurisdiction over APA claims where the federal government has not waived sovereign immunity, it mischaracterizes the relationship between the right of action contained in the first sentence of § 702 and the waiver of sovereign immunity contained in the second sentence of § 702. The first sentence describes the cause of action created by the APA, but it does not contain any jurisdictional limitation. *See Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 397–400 (3d Cir. 2012) (reviewing jurisprudence on this question and finding that the waiver of sovereign immunity in the second sentence of § 702 is not limited by the first sentence of § 702); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) (distinguishing between "the right of action contained in the first sentence of § 702" and "the waiver of immunity in § 702's second sentence"). Section 702's requirement of a "legal wrong" or a "relevant statute" therefore has no effect on the Court's jurisdiction in this case and Defendant's arguments based on this requirement are irrelevant.[5]

Moreover, § 702 has been interpreted by the federal courts as a broad waiver of sovereign immunity for all nonmonetary claims against federal agencies and their officers. *See, e.g.*, *City of*

---

[5] To the extent that Defendant is arguing that Plaintiff has failed to state a claim, the Court notes that Defendant did not move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Regardless, the Court is satisfied that Plaintiff has stated a cognizable APA claim by challenging a federal agency's final action as a violation of rights protected by Maryland's state laws. *See Bennett*, 520 U.S. at 175; *Lee*, 592 F.3d at 619.

*New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430 (4th Cir. 2019); *Treasurer of N.J.*, 684 F.3d at 397; *Trudeau*, 456 F.3d at 187; *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 524–26 (9th Cir. 1989). Plaintiff has raised a nonmonetary claim against NIH, a federal agency, so contrary to Defendant's contention, the APA's waiver of sovereign immunity applies in this case regardless of Plaintiff's allegation of state law violations. *See Treasurer of N.J.*, 684 F.3d at 397 n.19 (stating that the APA waives sovereign immunity for both alleged violations of federal law and alleged violations of state law).

Finally, none of the cases that Defendant cites in support of its contention that § 702 limits the Court's subject-matter jurisdiction to APA cases alleging violations of federal law are binding or persuasive. First, Defendant cites to a line in *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765 (7th Cir. 2011) stating that § 702's waiver of sovereign immunity "applies when any federal statute authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising under federal law," *id.* at 775, and argues that this must mean the waiver does not apply when a plaintiff seeks redress for a federal agency's alleged violations of state law, *see* ECF No. 16-1 at 12. This argument takes the quoted language out of context in a case that emphasizes the broad reach of § 702's waiver of sovereign immunity and where the court had no need to address whether that reach extended to alleged violations of state law. *See U.S. Army Corps of Eng'rs*, 667 F.3d at 774–76.

Defendant also cites to *Gettysburg Battlefield Preservation Ass'n v. Gettysburg Coll.*, 799 F. Supp. 1571 (M.D. Penn. 1992), where the court held that the APA did not waive sovereign immunity for alleged violations of Pennsylvania municipal ordinances and the Pennsylvania constitution. *Id.* at 1583. The conclusion in *Gettysburg Battlefield* seems inconsistent with the legislative history of § 702's waiver of sovereign immunity and more recent case law from a

variety of circuits emphasizing the broad reach of § 702's waiver. *See, e.g.*, H.R. REP. NO. 94-1656, at 6129 (stating that the purpose of § 702's waiver was "to eliminate the sovereign immunity defense in *all equitable actions* for specific relief against a Federal agency or officer acting in an official capacity" (emphasis added)); *Treasurer of N.J.*, 684 F.3d at 397–400 (reviewing cases); *Trudeau*, 456 F.3d at 186 (stating that § 702 "waives sovereign immunity for an action in a court of the United States seeking relief other than money damages" (internal punctuation omitted)). Thus, this Court will decline to follow the Middle District of Pennsylvania's decision in *Gettysburg Battlefield*.

Finally, Defendant cites to *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382 (3d Cir. 2012). *See* ECF No. 23 at 5. In *Treasurer of N.J.*, the Third Circuit determined that § 702 had waived sovereign immunity with respect to claims by New Jersey against the federal government arising under the state's unclaimed property laws and was then faced with the question of whether the district court otherwise had federal question jurisdiction to consider the claims. 684 F.3d at 401–3. Contrary to Defendant's assertions, the court expressly stated that it did not need to come to a conclusion as to the existence of federal question jurisdiction with respect to the state law claims because the presence of a separate Tenth Amendment claim unquestionably gave the district court subject-matter jurisdiction under § 1331. *Id.* at 403. Thus, *Treasurer of N.J.* provides no basis for finding that this Court lacks subject-matter jurisdiction by virtue of Plaintiff's allegation of state law violations.

Plaintiff's claim arises under the APA, a federal law, so the Court has subject-matter jurisdiction over Plaintiff's APA claim pursuant to § 1331. Defendant's motion to dismiss for lack of subject-matter jurisdiction is therefore denied.

### B. Plaintiff's APA Claim

Because the Court has determined that it has subject-matter jurisdiction to consider Plaintiff's APA claim, it will construe Defendant's motion as a Motion for Summary Judgment and consider whether Defendant's decision to prohibit Plaintiff from bringing a service dog in training to the NIH campus was unlawful under the APA. The APA permits a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). Plaintiff claims that Defendant's action violated the Maryland Service Animal Trainer Protections and therefore was not in accordance with the law. Because Maryland's Service Animal Trainer Protections do not apply to NIH, a federal enclave, Plaintiff's claim fails.

Article I of the Constitution provides Congress with the authority

> [t]o exercise exclusive Legislation in all Cases whatsoever, over such District[s] … as may, by Cession of particular States … become the Seat of the Government of the United States, and to exercise like authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. Art. I, § 8, cl. 17. "This constitutional provision has given rise to the federal enclave doctrine." *Colon v. United States*, 320 F. Supp. 3d 733, 745 (2018). "Generally speaking, the federal enclave doctrine establishes that the federal government obtains the right to choose whether state or federal law governs a territory from the time it exerts exclusive jurisdiction over that territory." *Id.*

"The general rule for identifying whether a state law is applicable on a federal enclave is as follows: a state law in effect at the time of cessation continues in effect as long as it does not conflict with federal purposes, but a subsequent state law has no effect unless (1) at the time of

15

cessation the state specifically retained jurisdiction over the subject matter at issue or (2) Congress specifically authorized the enforcement of the state law on the federal enclave." *Id.* at 746 (citing cases). Maryland ceded the NIH enclave to the United States in 1953, and it did not enact the Service Animal Trainer Protections until 1997. Those Protections therefore do not apply to the NIH enclave unless one of the two exceptions applies.

Plaintiff has not referenced any federal law that specifically authorizes enforcement of the Service Animal Trainer Protections on NIH's campus, so the Court must determine whether "at the time of cessation the state specifically retained jurisdiction over the subject matter at issue." *See id.* Plaintiff contends that the Court should rely on the general statute passed by Maryland in 1943 retaining concurrent jurisdiction over any land ceded to the United States to the extent allowed by the United States Constitution and consistent with the government purpose for which the land is held. *See* 1943 Md. Laws 923. According to Plaintiff, this statute requires that legislation passed in Maryland after 1943 be applied to that ceded land. Meanwhile, Defendant notes that in 1953, when Maryland ceded the land on which NIH sits, Maryland retained jurisdiction only for the purpose of service of process in civil and criminal cases. *See* 1953 Md. Laws 311–314. The 1953 statute did not specifically retain jurisdiction over any other subject matter, *see id.*, thus, according to Defendant, the Service Animal Trainer Protections do not apply. Defendant is correct.

First, the more specific 1953 statute supersedes the more general 1943 statute with respect to the NIH enclave. *See In re Wright*, 826 F.3d 774, 779 (4th Cir. 2016) ("A commonplace of statutory construction is that the specific governs the general. Along these lines, a more general provision should not be applied when doing so would undermine limitations created by a more specific provision." (internal punctuation and citations omitted)). In

16

determining the relationship between federal and state law with regard to this specific conveyance, the Maryland General Assembly made a specific choice in 1953 to retain jurisdiction over this property for the limited purpose of service of process notwithstanding the existence of the more general statute enacted ten years earlier.

Additionally, even considering Maryland's 1943 statute, it requires, in conjunction with the Supremacy Clause of the United States Constitution, that any state laws made applicable on land ceded by Maryland to the federal government not conflict with the United States Constitution or other federal laws. *See* U.S. Const. Art. VI, cl. 2 (stating that the Constitution and any laws and treaties made pursuant to the Constitution "under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"); *Kleppe v. Mexico*, 426 U.S. 529, 543 (1976) (stating that when Congress acts with respect to federal enclaves, "the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause"); MD. CODE. ANN., GEN. PROVISION § 6-201 (reserving jurisdiction and authority "to the fullest extent that is … allowed by the United States Constitution).

Congress has permitted the Administrator of the General Services Administration ("GSA") to regulate property owned or occupied by the federal government. *See* 40 U.S.C. §§ 121, 1315. With respect to HHS facilities in Montgomery County, Maryland, including NIH, GSA has delegated regulatory authority to the Secretary of HHS. *See* Delegation of Authority Regarding Control of Violations of Law of Certain Facilities Located in Montgomery County, Md., 33 Fed. Reg. 557, 604 (Jan. 17, 1968). It was pursuant to this authority that HHS and NIH promulgated 45 C.F.R. § 3.42(b). 55 Fed. Reg. at 2068. Thus, the Service Animal Trainer Protections conflict, or are at least inconsistent with, federal law authorizing HHS to regulate its

17

own facilities. *See Baltimore Gas and Elec. Co v. United States*, 133 F. Supp. 2d 721, 746 (D. Md. 2001) (stating that "[s]tate law is preempted [by federal law] when it actually conflicts with federal law, is generally inconsistent with federal law, or poses an obstacle to the full realization of Congressional objectives"). Therefore, even considering Maryland's 1943 general statute, in conjunction with the Supremacy Clause, the Service Animal Trainer Protections, enacted in 1997, do not apply to NIH under the federal enclave doctrine because they conflict or are inconsistent with federal law.[6]

Thus, the regulation governing Defendant's action is 45 C.F.R. § 3.42(b). Because § 3.42(b) prohibits the presence of animals "except for authorized purposes," and NIH regulations do not provide for the use of animals by trainers of service animals, such as Plaintiff, Defendant's decision to prohibit Plaintiff from bringing a service dog in training to work was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Defendant therefore acted lawfully under the APA.[7]

---

[6] Plaintiff cites to *Gillis v. Am. Pest Mgmt., Inc.*, Case No. AW–11–3760, 2012 WL 786282 (D. Md. Mar. 7, 2012) in support of his argument that Maryland state laws apply to NIH under the federal enclave doctrine. In *Gillis*, the court considered a case alleging violations of Maryland law for disability discrimination by a private contractor that placed employees at NIH. *Id.* at *1. The defendant removed the case to federal court on the ground that the plaintiff's employment took place on the NIH campus and therefore gave rise exclusively to federal claims. *Id.* at *2. The plaintiff filed a motion to remand, which the court granted. *Id.* at *1. *Gillis* differs from the instant case in key respects. First, the court was faced with the question of whether federal and state courts each had jurisdiction to entertain litigation growing out of conduct with respect to federal enclaves, *id.* at *2, which is a different question than whether a state has authority to legislate over federal enclaves. Second, there was no conflict between the state and federal laws relevant to that case. To the extent that the *Gillis* court held that Maryland retained concurrent legislative authority over the NIH enclave by virtue of the 1943 statute, this Court disagrees for the reasons stated.

[7] At various points in his opposition, Plaintiff appears to state a claim that Defendant violated 45 C.F.R. § 3.42(b), which prohibits animals on the enclave except for authorized purposes, because the Maryland Service Animal Trainer Protections provide the required authorization. Plaintiff did not raise this claim in the Amended Complaint, but even to the extent that the pleadings of self-represented litigants must be accorded liberal construction, *see Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 2019), this claim fails because, as the Court has already concluded, the Maryland Service Animal Trainer Protections do not apply on the NIH enclave and therefore cannot provide the necessary authorization. Moreover, to the extent that Plaintiff challenges the regulation itself as arbitrary and capricious or contends that Defendant's interpretation of its regulation was arbitrary and capricious, these claims fail as well. Section 3.42(b) is a reasonable interpretation of 40 U.S.C. §§ 121 and 1315, which generally provide GSA with broad authority to regulate property owned or occupied by the federal government (authority which has been delegated to HHS). NIH's interpretation of § 3.42(b) is also reasonable because § 3.42(b) explicitly requires

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss or, in the Alternative, Summary Judgment is granted. A separate Order shall issue.

Date: <u>January  14, 2020</u>                             <u>  /s/                                          </u>
                                                                             GEORGE J. HAZEL
                                                                             United States District Judge

---

authorization for animals and there are no NIH regulations that authorize use of service animals by trainers on the NIH enclave.